# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
# Judge Raymond P. Moore

Case No. 15-cv-00160-RM-STV

ANTONY SPENCER, *et al.*,

    Plaintiffs,

v.

CODY WALKER,

    Defendant.

_____

# OPINION AND ORDER
_____

Pending before the Court is defendant Cody Walker's ("defendant") motion to strike testimony of Steven Shuster ("Shuster") (ECF Nos. 72, 73). Plaintiffs Antony Spencer ("Spencer") and Laurie Bene' Rolfe Spencer (collectively, "plaintiffs") have responded in opposition to the motion (ECF No. 86), and defendant has filed a reply in support (ECF No. 87). The Court makes the following findings.

## I.    Legal Standard

Rule 702 of the Federal Rules of Evidence ("Rule 702") governs the admission of expert evidence in federal court. Fed.R.Evid. 702; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167 (1999). Rule 702 provides as follows.

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and

methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702.

The Court's role in considering proposed expert evidence is one of a "gatekeeper." *Kumho Tire*, 526 U.S. at 147. Factors that might be relevant in carrying out this role include: (1) whether a theory or technique can be or has been tested; (2) whether a theory or technique has been subjected to peer review and publication; (3) whether there is a high known or potential rate of error to a technique and whether there are standards controlling the technique's operation; and (4) whether the theory or technique enjoys general acceptance within a relevant community. *Id*. at 149-150. These factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id*. at 150 (quotation omitted).

The proponent of expert evidence bears the burden of establishing its admissibility. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001).

## II.  Discussion

Defendant objects to the admission of testimony from Thomas for four principal reasons: (1) Shuster's opinions are not based upon specialized knowledge; (2) Shuster's opinions are unreliable; (3) Shuster's opinions will not help the trier of fact; and (4) Shuster's opinions would be prejudicial. (ECF No. 72 at 5-18.) Plaintiffs respond that the motion to strike should be denied because (1) the motion is untimely, (2) Shuster was hired to compile data from multiple sources to calculate an overarching damages figure, (3) defendant's objections go to the weight of Shuster's testimony, rather than its admissibility, and (4) Shuster's testimony relates to a relevant issue in this case, and thus, is helpful. (ECF No. 86 at 2-8.)

The Court believes it need spend little time on whether Shuster's testimony and report warrant admission as expert evidence under Rule 702 because Shuster himself has answered that question. Specifically, in a memorandum dated June 20, 2016 (ten days before the date of the most recent of Shuster's two reports)[1], Shuster stated that, "[f]rom the perspective of a financial expert witness, [he] needs more supporting documents especially quantifiable proofs to back up these oral testimonies." (ECF No. 72-8 at 1-2.) Shuster concluded his memorandum as follows: "Shuster is trying to emphasize that the deposition records are insufficient for a financial expert to prove and calculate the economic loss." (*Id.* at 3.) In other words, based upon Shuster's own statements, he would not want his own report considered as expert evidence to prove and calculate plaintiffs' economic loss. There really is little more that need be said, but the Court will say more just so some of the problems with Shuster's reports are recorded.

First, Shuster's calculation of Spencer's lost advisory fee income. Everything seems fine with Shuster's calculation in that, as Shuster states, it is "pretty straight forward" to multiply 75,000 by 5, and then perform a currency conversion. (*See* ECF No. 72-5 at 1.) The problem is that, that calculation is pretty straightforward and can be performed by a juror. There is no need for Shuster to do it for the jury. Shuster adds to the loss of advisory fee income Spencer's cost in allegedly having to hire people due to Spencer's incapacity. The cost of hiring extra individuals, as Shuster states, is "substantiated by invoices" (*see id.*), so, again, the jury can perform the rudimentary calculation of adding the total amount of however many invoices there may be. In any event, Shuster

---

[1] The record reflects that Shuster has prepared two reports for plaintiffs: one dated November 27, 2015, and a second dated June 30, 2016. (ECF Nos. 72-1, 72-2.) Because the findings in the November 2015 report are largely subsumed within the June 2016 report, the Court will reference only the June 2016 report going forward.

3

provides no explanation for why each of the individuals listed in the report were hired *due* to Spencer's incapacity, especially given that one of the individuals was paid for services rendered nearly a year after Spencer's injury and another was paid for services ranging from over one year to over two years after the injury. (*See* ECF No. 72-2 at 7.)

Second, Shuster's calculation of Spencer's lost income in acquiring a partner's shares in various entities held by Spencer and the partner. Shuster states that Spencer agreed to purchase the shares in June 2011 for nearly three million pounds, but, due to Spencer's incapacity, the shares were not bought until September 2015 for a little over five million pounds, resulting in a loss to Spencer of roughly $3.3 million. (*Id*. at 7-8.) Missing from this analysis is why Spencer did not close on his deal between June 2011 and the date of the injury in December 2012. Shuster states the problem very well himself: "We probably need to get some clarification of why this sale did not happen between 2010 and the time of the accident."[2] (*See* ECF No. 72-7 at 2.)

Third, Shuster's calculation of Spencer's medical expenses. As one might expect with medical expenses, the amounts listed in Shuster's report are "[s]ubstantiated by invoices." (*See* ECF No. 72-5 at 1.) Again, the question is why can a jury not perform the simple arithmetic of adding together all of Spencer's medical expenses? The answer is a juror can, and thus, Shuster's testimony in this regard is not necessary or helpful.

Fourth, Shuster's calculation of Spencer's increased cost of living due to Spencer's injuries. Shuster states that Spencer has incurred costs from hiring a driver and using taxis. (ECF No. 72-2 at 9.) Shuster does not state that he used his expertise to calculate these amounts, instead he relied

---

[2] Shuster's report states that Spencer first agreed to purchase his partner's shares in June 2010, but a year later the two revised their agreement. (ECF No. 72-2 at 7.)

upon emails and Spencer's estimates. (*See id*; ECF No. 72-5 at 1; ECF No. 72-6 at 1.) Yet again, the Court asks why plaintiffs cannot present the relevant emails and Spencer's estimates to the jury and expect it to perform the calculation Shuster has performed. The answer, again, is that a jury can, and will in this case. Shuster also states that, prior to his injury, Spencer regularly took economy class flights for travel, but, after the injury, he was forced to take first or business class flights in order to have space for his injured leg. (ECF No. 72-2 at 9.) Apart from the fact that there is no basis for saying that Spencer regularly used economy class for flights prior to his injury, Shuster also speculates that "the price difference *can* be high as [roughly seven thousand pounds] per trip." (*See id*.) (emphasis added). The basis for this speculation? A quote from a travel agency Spencer frequently uses. (*See id*.) What is not the basis? Actual receipts for flights taken in first or business class and rates for economy class flights, whether at the time of Spencer's purported flight(s) or not. Such speculation is neither reliable nor helpful to a jury.

Fifth, Shuster's calculation of lost profits on missed development opportunities. As brief background, it is helpful to know that Spencer is described in Shuster's report as an "extremely successful and experienced real estate developer." (ECF No. 72-2 at 5.) Shuster states that, in 2013, an opportunity arose to acquire a property in London, which would have resulted in a fee of 80,000 pounds, but the opportunity was lost due to Spencer's incapacity. (*Id*. at 10.) The Court's immediate question is how does Shuster know that Spencer lost this opportunity *due* to his incapacity? Apparently, Shuster does not, given that he has stated that "I'm not sure on this one" in reference to lost profits on missed development opportunities. (*See* ECF No. 72-5 at 1.) To the extent Shuster is relying on an email (*see* ECF No. 72-6 at 1), there is no explanation for why an email would provide Shuster with the basis for calculating an 80,000 loss in this regard. If the basis is Shuster's

5

acceptance of all information provided to him as true, that is not a sound way to be calculating plaintiffs' economic losses. A witness could accept as true the statement that the cloudless sky is green, but that would not make the statement any more true or the witness' statement that the cloudless sky is green any more reliable or helpful. In other words, it was incumbent upon Shuster to satisfy himself that the reasons given to him for why plaintiffs have suffered economic losses were sound in light of his field of expertise's principles. The fact that Shuster appeared far from satisfied (*see* ECF No. 72-8 at 1-3) is thus illuminating.

Finally, Shuster's calculation of additional losses based upon various depositions. As an initial matter, Shuster describes these losses as "possible". (ECF No. 72-2 at 10.) What that word is meant to mean in this context is not clear. Shuster was hired to calculate plaintiffs' economic losses (*see id*. at 3), not their "possible" economic losses. In any event, as will be seen *infra*, Shuster was quite correct to call the purported losses "possible" because none of them have any basis in actual evidence. The first additional loss is that Spencer's monthly advisory fee was reduced by 30,000 pounds per month for 37 months because Spencer was unable to take part in the early stages of a project, which slowed the progress of the project. (*Id*. at 10.) There is no basis, at least not within Shuster's expertise, for the statement that the project was slowed due to Spencer's inability to take part in its early stages, and, there is even less basis for the assumption that Spencer continued to receive a reduced advisory fee for 37 months due to his inability to take part in the project in its early stages. As Shuster himself has stated, he "[n]eed[s] support for fee reduction of 37 months." (*See* ECF No. 72-7 at 1.)

The next slice of additional losses is expenses from a lawsuit filed against Spencer by tenants of one of his properties. Shuster states that issues with the tenants arose in 2013-2014, and,

6

according to a deposed witness, those issues would not have gone to trial if Spencer had been managing the affairs of the property. (ECF No. 72-2 at 11.) It is notable that Shuster does not even attempt to say that Spencer was not managing the relevant property *due* to Spencer's injuries. (*See id*.) In any event, the Court cannot understand how the speculation of another person, even if the person is apparently Spencer's attorney in the United Kingdom, can produce a finding that a lawsuit would not have been filed. Shuster does not appear to understand fully either, given that he has stated that this is an item that "probably would not have happened if not for the accident," and, to "substantiate" it, Shuster could ask for information as to whether Spencer ever faced issues with tenants before the accident. (*See* ECF No. 72-5 at 1.) That would be very helpful. Also helpful would be evidence showing that Spencer was not managing the property at the time the issues arose *due* to his injuries.

Further additional losses come from a missed two percent "buyer fee" for a project. Shuster states that, according to a deposed witness, had the project proceeded as planned Spencer would have negotiated the purchase of 200 million pounds of property, earning 4 million pounds in fees in the process. (ECF No. 72-2 at 11.) The deposed witness further testified that Spencer would have earned an additional four million pounds in fees from the re-sale of the same properties. (*Id*.) If only all income could be so easily presumed. Simply put, there is simply no basis, and again, certainly none based upon Shuster's expertise, to justify such projected income. Shuster's own summary of the basis for this purported lost income is again illuminating: "Everything in this category is all based on opinion of what could have happened. While everyone deposed seems to agree that had Mr. Spencer been there he would have aggressively bought up properties … there is no way to 'prove'

this so I'm not sure on this one." (*See* ECF No. 72-5 at 1.) The Court is sure of one thing—there is no basis for plaintiffs to present evidence of this loss as expert testimony.

Another additional loss is described as missed "uplift" opportunities, which appears to mean buying properties, renovating them, and then selling them for a profit. (*See* ECF No. 72-2 at 11.) Shuster states that, according to a deposed witness, Spencer averaged two-three transactions of this ilk between 2008 and 2012, with an average profit of two million pounds, but, between 2013 and 2015, Spencer completed no such projects. (*Id.*) Shuster then took the low estimate of two transactions per year, multiplied this by three years, and then multiplied that by two million pounds. (*Id.*) Shuster again provides an illuminating analysis of the lack of information supporting the losses in this regard: "It would be nice to see some documentation of that past activity.…If we could get the returns/financials for the company that did these 'uplifts' and show a consistent pattern that abruptly ended in 2013, that would help." (*See* ECF No. 72-5 at 2.) That would help. It would also help to have *any* evidence of actual opportunities to "uplift" properties between 2013 and 2015, *any* evidence of actual costs to renovate those properties, and *any* evidence that Spencer could have made an actual profit on those properties.

Moreover, with respect to this category of purported losses, which is the largest in value at just over $19 million, it is particularly important for there to be at least some indication of some element of expertise being utilized to create the estimated losses, such as expertise in valuing property or in assessing "uplift" opportunities. The fact that such expertise may be beyond Shuster's area of expertise is beside the point. Plaintiffs should have hired an expert who could quantify their losses. Instead, Shuster appears to have relied upon deposition testimony that Spencer made "uplift" purchases in the past, and thus, he would have done so on the exact same trajectory in the future.

8

(*See* ECF No. 72-2 at 11; ECF No. 72-6 at 2.) Yet again, that is no basis for plaintiffs to present evidence of this loss as expert testimony.

Ultimately, it is plaintiffs' burden to establish the admissibility of Shuster's testimony, *see Ralston*, 275 F.3d at 970 n.4, and they have not done so, even in the eyes of their own expert. According to plaintiffs, "Shuster was not hired to make a determination as to the likelihood that Mr. Spencer's claimed damages might be realized." (ECF No. 86 at 7.) If that is the case, for what reason was he hired? Shuster's report states that he was hired to calculate plaintiffs' economic losses. (ECF No. 72-2 at 3.) Essentially, plaintiffs are saying that Shuster was hired to compile data, but he has not used any expertise in doing so, at least not on the face of the expert report or from Shuster's own statements about his report. It is not as if any of the losses proposed in Shuster's report are for expected future lost income, which would necessarily involve some degree of possibility or probability. All of the losses listed in the report, instead, are for losses from the date of Spencer's injury up to the date of the report. The fact that some of the losses are for "missed opportunities," and thus, may be harder to quantify, does not mean that Shuster can avoid applying any meaningful principles or methodology in calculating them. And, contrary to plaintiffs' apparent contention, the fact that Shuster "added together [ ] various sources of damages" and applied a conversion rate from pound sterling to dollars (*see* ECF No. 86 at 6) is not a methodology—it is simple arithmetic.[3]

As a result, the Court finds that Shuster's report is not based upon reliable principles and would not be helpful to the trier of fact.

---

[3] Also contrary to plaintiffs' contention, the lack of reliability and/or helpfulness of Shuster's report does not mean that his testimony is admissible because defendant can cross-examine him. (*See* ECF No. 86 at 4-7.) Although the Court does not doubt that defendant may be able to undermine many of the purported losses contained in the report, that does not make the report any more reliable or helpful to the jury.

9

All that is left with respect to the motion to strike is plaintiffs' argument that it is untimely. The Court will spend little time on this argument. The Court has reviewed the record, which includes listening to the hearings before the Magistrate Judge, and notes that plaintiffs are skating on late May ice when it comes to anything related to the issues of timeliness and their claims of lost income. As defendant asserts, given the timing of produced documents related to plaintiffs' lost income claims (*see* ECF No. 72 at 14-15), the Court finds that the motion to strike was not untimely.

As a result, the Court GRANTS the motion to strike (ECF No. 72), thereby excluding Shuster from testifying at the upcoming trial.

## III. The Final Pretrial Order

Based upon the Court's review of the Final Pretrial Order (ECF No. 100), there appear to be two issues defendant presents therein: (1) extending the time for the parties to exchange exhibit lists; and (2) setting times for the submission of designations related to several "preservation depositions." (*Id*. at 4-5.)

As to the first matter, the request is GRANTED. The parties shall exchange amended exhibit lists on or before June 15, 2017. The parties will not be allowed to use any exhibits not contained in the amended lists at the upcoming trial.

As for the second matter, the request is also GRANTED to the extent that the parties are ORDERED to confer and prepare a joint schedule for deposition designations. To the extent, the parties cannot mutually agree on a schedule, then they may prepare their own proposed schedules. The parties shall submit a joint or their own schedule(s) on or before June 5, 2017. In preparing their schedule(s), the parties should remember that the trial preparation conference is set for July 21, 2017. (ECF No. 101.) The Court will not allow any designations to be submitted after that date, or even

in the week before that date. The Court further notes that irrespective of the parties' agreement or lack thereof with respect to the deposition-designation schedule, the Court will set the final schedule.

## IV. Conclusion

For the reasons discussed herein, the Court GRANTS defendant's motion to exclude testimony of Steven Shuster (ECF Nos. 72, 73).

**SO ORDERED.**

DATED this 30th day of May, 2017.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge